**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-1479-WJM-NYW

SINKSAR YOSEPH, also known as Senksar Kelebe,

     Plaintiff,

v.

KAVOD SENIOR LIVING/ALLIED JEWISH APARTMENTS,

     Defendant.

---

## ORDER ON PENDING SUMMARY JUDGMENT MOTIONS

---

Plaintiff Sinksar Yoseph (a.k.a. Senksar Kelebe or "Mimi" Kelebe) ("Yoseph") sues her former employer, Defendant Kavod Senior Living/Allied Jewish Apartments ("Kavod"), for race, color, and national origin discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and in violation of 42 U.S.C. § 1981; and for retaliation for allegedly complaining about such discrimination, in violation of the same statutes. (ECF No. 1.)

Before the Court is Yoseph's Motion for Summary Judgment. (ECF No. 45.) Yoseph seeks summary judgment against Kavod as to liability only on her retaliation theories. Also before the Court is Kavod's Motion for Summary Judgment. (ECF No. 46.) Kavod seeks summary judgment against Yoseph on all of her theories. For the reasons explained below, the Court grants Yoseph's motion on a limited issue regarding whether she suffered a materially adverse employment action, but otherwise denies her motion; and the Court grants Kavod's motion on Yoseph's Title VII and § 1981

discrimination claims, but otherwise denies Kavod's motion. In short, this case remains set for trial, but that trial will address only Yoseph's retaliation claims, including whether she timely filed them.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to one party or the other.[1]

### A.    Yoseph's Hiring & Initial Responsibilities

Kavod hired Yoseph on March 27, 2010. (ECF No. 46 at 2, ¶ 1.) Jennifer Grant

---

[1] So that the record may be complete, the Court ignores any evidentiary objection based solely on irrelevance.

("Grant"), Kavod's Assisted Living Director, made the decision to hire Yoseph, and was Yoseph's direct supervisor for the duration of Yoseph's employment with Kavod. (*Id.* ¶ 4.) Yoseph is a black female of Ethiopian national origin. (*Id.* ¶ 2.)

Yoseph worked for Kavod as a "Resident Assistant." (*Id.* ¶ 1.) A Resident Assistant's responsibilities largely comprised "working with residents of the Assisted Living Department at Kavod, including bathings, . . . serving in the dining room, delivering food to residents, collecting laundry, and ironing, among other things." (*Id.* ¶ 3.)

## B.     Change to Medication Distribution Procedures

For most of Yoseph's tenure with Kavod, Kavod administered residents' routine medications by splitting up certain duties between a "Wellness Coordinator" and the Resident Assistants. Specifically, "Kavod's 'Wellness Coordinator' would fill a Medication Reminder Box with routine medications and the Resident Assistants would administer medicine to the residents from the Medication Reminder Box." (*Id.* ¶ 5.) However, Kavod decided in November 2013 to eliminate Medication Reminder Boxes, and instead have the Resident Assistants administer medications at the proper time directly from the original containers. (*Id.* ¶ 5; *id.* at 4–5, ¶¶ 14, 15, 24.)

The first reason for this change flowed from a seminar Grant attended that month, at which "a representative from the Colorado Department of Public Health and Environment ('CDPHE') indicated CDPHE would announce a regulation prohibiting the practice of pre-pouring medication in advance of administering the medication to residents." (*Id.* ¶ 6.)[2] Pre-pouring is not the same as using a Medication Reminder

---

[2] Yoseph denies this assertion for three reasons. (See ECF No. 49 at 2, ¶ 6.) First, she objects that the CDPHE official's reported statements are hearsay. However, for present

Box, but "the two concepts of pre-arranging medications are very similar and CDPHE does not recommend the practice of using Medication Reminder Boxes." (*Id.* ¶ 7.)[3]

According to Kavod, problems with overtime work also prompted the change in medication administration procedures. Kavod "Program Director and Service Coordinator positions" required substantial overtime work in 2012 and 2013. (*Id.* at 3, ¶ 8.) Kavod claims that, given this, it chose to transfer certain duties from those positions to the Wellness Coordinator, who in turn could take on the new responsibilities because the Wellness Coordinator would no longer be filling Medication Reminder Boxes. (*Id.* at 3–4, ¶¶ 9–13.) Yoseph denies that this rearrangement of assignments to reduce overtime was a true motivation, claiming that Kavod's assertions are belied by its failure to change the Wellness Coordinator's job description following the change. (ECF No. 45 at 2, ¶ 8; ECF No. 49 at 2, ¶¶ 9–10.)

Regardless of Kavod's motivations, Kavod announced the change to all Resident Assistants in a staff meeting on November 20, 2013. (ECF No. 46 at 5, ¶ 24.) The

---

purposes, the relevant inquiry is whether Grant *heard* those statements, not whether those statements were true. Thus, Grant's account of what she heard is admissible. Second, Yoseph objects that a CDPHE memorandum formally announcing the new rule, *see* ECF No. 46-2 at 25–26, is hearsay and unauthenticated. That document is dated July 1, 2014, and therefore postdates all of the events relevant to this lawsuit. The Court finds that this objection is immaterial to the present analysis. Third, she claims that Kavod's Position Statement submitted to the EEOC in response to her charge of discrimination "indicated that the Medical Administration Procedures were being amended as of December [2013]. The changes were intended to reduce the risk of error in medication and reduce time spent including overtime." (ECF No. 49 at 2, ¶ 6 (citing ECF No. 49-10 at 1).) The overtime-related justification is separate and will be addressed separately in the main text. As for reducing the risk of error, Yoseph seems to be trying to point out an inconsistency, but does not explain what it might be. Accordingly, Yoseph has failed to offer a proper basis for denying Kavod's assertion regarding what Grant learned at her seminar. Yoseph has also offered no evidence from which a jury could conclude that Grant was lying about or misremembering what she learned there. Kavod's account is therefore deemed admitted. *See* Fed. R. Civ. P. 56(c)(1).

[3] Yoseph denies and objects to this assertion for all the same reasons as the prior assertion, and the Court finds for the same reasons that this statement is deemed admitted.

Resident Assistants at that time "consisted of individuals who were male and female; black[ and] white . . . ; and also of various national origins, including American, Russian and African." (*Id.* ¶ 19.)  The Wellness Coordinator at the time was Sara Diaz, a Hispanic female born in the United States.  (ECF No. 47 at 2, ¶ 6.)

The Resident Assistants were not pleased with this announcement, and voiced their disapproval during the staff meeting.  (ECF No. 46 at 6, ¶ 25.)  Their main worry was the amount of extra time it would take to administer medications under the new procedures.  (ECF No. 45 at 3, ¶ 10.)  Yoseph and a few other Resident Assistants continued their protests in a smaller meeting with Grant directly after the staff meeting.  (ECF No. 46 at 6, ¶¶ 29–30.)  They asserted that, "if Resident Assistants were going to implement these changes, they should get a raise."  (*Id.* ¶ 29.)  Grant replied that Kavod would not be raising wages for Resident Assistants based on these new duties.  (*Id.* ¶ 30.)  At some point either in the staff meeting or the follow-up meeting, Grant interrupted the Resident Assistants' complaints by making a "time out" gesture with her hands.  (ECF No. 45 at 3, ¶ 10.)  Yoseph claims that Grant also shouted, "I said, do it!" (*Id.*)

According to Kavod, nobody in the staff meeting and nobody in the subsequent meeting with Grant claimed that these new job responsibilities discriminated against employees based on their race, gender, or national origin.  (ECF No. 46 at 6, ¶¶ 26, 31.)  Yoseph counters by pointing to her EEOC charge, filed on July 19, 2014, where she recounted the following:

> In or about November 2013, my Supervisor changed my job duties.  I believe this was discrimination because the change in duties made my work more difficult because I was not born in America, while it made job duties for employees who

> were born in America much easier. . . . On or about
> November 20, 2013, I complained to my Supervisor and let
> her know I felt that I was being discriminated against.

(ECF No. 49-13 at 1.)

On November 25, 2013, Yoseph and four other Resident Assistants met with Kavod's human resources director, Christine Dewhurst ("Dewhurst"), and "expressed concerns that they were being disrespected, not allowed to raise questions about the working conditions, and that they were being required to do [Sara Diaz's] job." (ECF No. 45 at 3, ¶ 11.) Yoseph alleges that she, specifically, "stated that she believed the group of Resident Assistants, who were primarily African immigrants, was being treated unequally in favor of [Diaz], a white female." (*Id.*) Dewhurst denies that anyone voiced such a complaint at this meeting. (ECF No. 47 at 3, ¶ 11; ECF No. 47-6 ¶ 3.)

The changes went into effect in December 2013. (ECF No. 46 at 4, ¶ 15.) Kavod had estimated that the Resident Assistants' additional duties would require about thirty minutes per shift. (*Id.* ¶ 16.)[4] Yoseph says that, in practice, this was a significant underestimate, consuming so much time that she "was forced to skip lunch and any break and to rush through assignments." (ECF No. 49 at 3, ¶ 16.) It is undisputed, however, that Kavod's payroll records show "no overtime or additional hours were accrued by any of the Resident Assistants due to the change." (ECF No. 46 at 7, ¶ 33.)

## C. Yoseph's Leave Request in January 2014

As of January 2014, Yoseph was regularly scheduled to work every Friday, Saturday, Sunday, and Monday from 3:00 PM to 11:00 PM. (*Id.* at 8, ¶ 40.) On

---

[4] Yoseph denies this assertion, but only presents evidence that it turned out to be inaccurate in practice. (ECF No. 49 at 3, ¶ 16.) Yoseph presents no evidence showing that Kavod never made this pre-implementation estimate. Thus, the fact of the estimate is undisputed.

January 10, 2014, however, she told Grant that she was going back to school and would require every Saturday and Sunday off through April to attend certain classes. (*Id.* ¶ 41.)  Yoseph told Grant that she had already found two specific employees (identified as "Seta" and "Saba") who would cover for her on all of those days.  (ECF No. 45 at 4, ¶ 14.)

Grant helped Yoseph fill out an Employee Leave Request form, although Grant did not sign that request form.  (ECF No. 47 at 5, ¶ 15.)  Grant instead wrote on the form, "Every Sat-Sunday through April.  Have covered 2 wks (4 shifts) while schedule is reviewed (through end of January)."  (ECF No. 46-2 at 111.)

Grant claims she filled out this form on January 13, 2014 (the Monday after Yoseph spoke with her about the leave request).  (ECF No. 46 at 8, ¶ 43.)  Yoseph denies ever meeting with Grant on that date (ECF No. 49 at 5, ¶ 43), but does not state precisely when the Employee Leave Form was filled out.

Yoseph claims that the filled-out Employee Leave Request represents Grant's approval of the entire time-off request through April.  (ECF No. 45 at 4, ¶ 15.)  It is undisputed, moreover, that Grant updated the employee schedules for February and March to reflect that Yoseph's pre-arranged substitutes, Seta and Saba, would be working in her place.  (*Id.* ¶ 16.)  But Kavod has a different explanation.  It was then planning to adopt restaurant-style dining for its residents in the next couple of months.  (ECF No. 46 at 8, ¶ 44.)  Grant says that she was in the middle of preparing employee schedule changes linked to the rollout of restaurant-style dining "and would know by the end of January whether the request [Yoseph] made could be approved."  (*Id.* ¶ 45.)  Grant claims that she updated the work schedule to reflect that Yoseph's substitutes

would cover her shifts, but only "until the new schedule was made for the conversion to restaurant-style dining or someone was hired into the position to take those shifts." (ECF No. 47 at 5, ¶ 16.)

Grant was also concerned because, she says, another Resident Assistant spoke with her on January 12, 2013 (the day before Grant allegedly filled out the Employee Leave Request form) and informed her that "the residents were upset due to inconsistent staffing . . . on the weekend evening shift, which was [Yoseph's] shift." (ECF No. 46 at 8, ¶ 46.) According to Grant, this Resident Assistant also accused Yoseph of "missing her shifts and asking others to cover for her and it had been going on for a long time." (*Id.* at 9, ¶ 48.)[5] Grant says she then audited Yoseph's timesheets and learned that Yoseph "had been switching shifts and/or taking time off and finding coverage nearly every weekend since August 2013." (*Id.* ¶ 49.) "Upon review and audit of [Yoseph's] time sheets and absences," she says, "it was clear [Yoseph] could not work at least half of her assigned shifts through April 2014 and coverage was excessively required." (*Id.* ¶ 50.)

Yoseph denies all of this, claiming that "Grant never told [her] of any problems with her attendance" and "[Kavod] never informed [her] of any resident complaints or concerns" (ECF No. 49 at 5, ¶¶ 46, 47)—and thereby, it appears, drawing an inference that these events did not happen or else she would have learned about them directly. Yoseph also seems to be accusing Grant of fabricating the timesheet audit. Although Grant's report of that audit refers almost exclusively to Yoseph (ECF No. 46-2 at 108–

---

[5] Yoseph objects that the other Resident Assistant's statements are hearsay. (ECF No. 49 at 5, ¶¶ 46–48.) But Kavod offers these statements for their effect on Grant, not necessarily for their truth. The objection is therefore overruled.

09), Yoseph herself claims that "[a]ll of the switches listed in Grant's audit were made by Grant to cover for other missing Resident Assistants." (ECF No. 49 at 6, ¶ 49.)

## D.    January 13, 2014 Protest Letter & Related Meetings

On January 13, 2014, Yoseph and four other female Resident Assistants met with Dewhurst to present a letter they had prepared and signed that day. (ECF No. 45 at 4, ¶ 19.) Two of the other signatories were, like Yoseph, black African immigrants; the remaining two were white Russian immigrants. (ECF No. 46 at 16, ¶¶ 108–11.) The letter reads, in full, as follows:[6]

> To whom it may concern:
>
> We are imploring you to help us to have a privilege of fair and equal treatment of our work administration.
>
> Despite of being dedicated to our job with love and respect we could not have a privilege of fair an equal treatment of our administration in our work activities.
>
> At the regular monthly meeting that happened on November 20 2013, Ass. Living Director told us that the character of worked changed into the situation that is not comfortable for us to work with. Instead of giving the residents medication from MRB, we have to give them from the bottle or pop. When she said this we explained that it was too much work and difficult for us to do this on top of the other work. We are going to have more responsibility and this work should be done by the nurse. Second our job should be specified and known. When we explained to her like this she responded in a very shocking and unexpected way, that we have two options. Either you have to work what I tell you or leave to other facilities.
>
> Later we went to Human resource personnel and explained the situation. Then the H.R. personnel promised to improve the situation. The Ass. Living Director said it would be easy

---

[6] This letter contains numerous spelling and grammatical errors. The Court reproduces these verbatim, given that this case turns in part on Kavod managerial employees' reaction to communications received from or associated with Yoseph. It is not clear who actually drafted the letter—the first signatory is Larissa Marinska, one of the Russian employees.

when you adapted it.  But first of all we did not find it easy.
Second the H.R. personnel did not do change.

As we said above we like our job and our resident, a nice
place to work.  We never complain before.  But now despite
we are dedicated to our work, we are applying to H.R.
personnel to help us know our job, and privilege of not losing
the fair and equal treatment of administration in our work
activities.  Thank you for your cooperation.

[Signatures.]

(ECF No. 47-3.)

Yoseph alleges that, in the course of the meeting with Dewhurst that day, "the
group expressed concern that they as African immigrants were being treated unfairly."
(ECF No. 45 at 4, ¶ 20.)  It is not clear what Yoseph means by "the group," given that
not all of them were African immigrants.  Regardless, Dewhurst responded that Grant
was responsible for addressing their grievances.  (ECF No. 47 at 6, ¶ 20.)

Grant met with Yoseph and the other four on either January 27 or 29, 2014—the
parties dispute the precise date.  (ECF No. 45 at 5, ¶ 21; ECF No. 47 at 7, ¶ 21.)  The
parties agree, however, that Grant announced she would meet which each of them
individually about their upcoming work schedules.  (*See id.*)  At no point in this meeting
did Yoseph or any of the others complain about discrimination based on race, color, or
national origin.  (ECF No. 46 at 10, ¶ 56.)[7]

## E.    Yoseph's Separation in February 2014

By the beginning of February 2014, Grant had worked out schedule changes
necessary to accommodate the change to restaurant-style dining.  (*See id.* ¶¶ 57–58.)
She determined that Yoseph's normal 3:00 PM to 11:00 PM schedule, Friday through

---

[7] Yoseph denies this, but only by asserting that there was no meeting on January 27, as
opposed to January 29.  (ECF No. 49 at 6, ¶ 56.)  The precise date of the meeting is immaterial,
and so Yoseph's denial is ineffective.  This matter is deemed admitted.

Monday, would change to 2:30 PM to 9:30 PM on the same days. (*Id.* ¶ 61.) "Similar schedule changes were planned for all the Resident Assistants." (*Id.*)

On February 7, 2014, Yoseph claims she learned directly from Achamyelesh Wagaye (one of the other black African signatories to the January 13 protest letter) that Wagaye had been suspended for three days. (ECF No. 45 at 5, ¶ 22.)[8] Yoseph does not claim she was ever told the reason for Wagaye's suspension.

On February 14, 2014, Yoseph and Grant had some sort of telephone conversation. According to Grant, she informed Yoseph that "she would be converted to 'on-call' status" because her planned absences made her "unable to work her new scheduled shift." (*Id.* at 11, ¶¶ 65–69.) According to Yoseph, however, this call comprised nothing more than a request from Grant to substitute for another Resident Assistant's shift later that day. (ECF No. 45 at 5, ¶ 24; ECF No. 49 at 7, ¶ 67.) Yoseph continues that she went to work that evening and noticed her name was no longer on the upcoming work schedule. (ECF No. 45 at 5, ¶ 24.) She also saw a new job posting for a Resident Assistant position with a schedule identical to her usual schedule. (*Id.*) Kavod agrees that, "as of February 14, 2014, a new job posting for [Yoseph's] schedule was posted." (ECF No. 47 at 8, ¶ 24.)

On February 15, 2014, Yoseph called Grant, asking why Grant had posted Yoseph's job. (ECF No. 46 at 11, ¶ 71.) Grant told Yoseph (for the second time,

---

[8] Kavod objects that what Yoseph heard from Wagaye is hearsay. (ECF No. 47 at 7, ¶¶ 22–23.) It appears Yoseph includes this allegation regarding Wagaye to prove the underlying fact, *i.e.*, that Wagaye was suspended. Thus, the Court agrees that, as presented, this is hearsay. However, Wagaye is listed as a witness on the Final Pretrial Order. (ECF No. 58 at 7.) She could therefore testify about her suspension from personal knowledge. Moreover, Kavod admits that she was suspended, claiming that it arose from instances of Wagaye losing her temper. (ECF No. 47 at 7, ¶ 22.) Kavod's hearsay objection is therefore overruled as moot.

according to Kavod) that she would be converted to on-call status beginning March 3, 2014 because "she was unable to work the shifts she was scheduled." (*Id.* at 12, ¶ 72.) Yoseph protested that she had already arranged for Seta and Saba to cover all of her planned absences. (*Id.* ¶ 73.) Grant replied that the change "was not only about whether [Yoseph] could find coverage, but the importance [to] the [Assisted Living] Department to provide consistency to the residents." (*Id.* ¶ 74.) Grant stated that "the inconsistency resulting from [Yoseph] finding coverage for two shifts every weekend until the end of April would cause too much disruption for too long, particularly with the upcoming [conversion] to restaurant-style dining." (*Id.* ¶ 75.)

Yoseph and Grant met in person on February 18, 2014. (ECF No. 45 at 5, ¶ 25; ECF No. 46 at 12, ¶ 77.) They again "discussed the changes to the schedule for restaurant-style dining and the alterations to the shifts." (*Id.*) Grant repeated that "the issue was not whether [Yoseph] could find coverage, but rather the need for consistency for the residents and the program." (*Id.* at 13, ¶ 80.) Grant then told Yoseph about an available Sunday-to-Monday housekeeping position that would guarantee twelve scheduled hours per week. (*Id.* ¶ 81.) But Grant made clear that the schedule changes would take place effective March 3, 2014, regardless of Yoseph's disagreement. (*Id.* ¶ 84.)

According to Grant, Yoseph refused to work on-call, and Grant then "asked her if she meant she would rather not work at Kavod at all versus being on-call," to which Yoseph allegedly answered, "Yes." (*Id.* ¶ 87.) Grant says she understood this to mean that Yoseph was resigning her employment. (*Id.* ¶ 87.) This apparently ended the conversation. Throughout the exchange, Yoseph made no complaints about

discrimination based on race, gender, or national origin. (*Id.* ¶ 88.)

On February 20, 2014, Yoseph slipped a handwritten note under the human resource department's door, addressed to Dewhurst. (ECF No. 45 at 6, ¶ 26; ECF No. 45-8.) In the note, Yoseph complained of having "been treated unfairly" and stated that she "want[ed] [her] regular schedule back." (*Id.*) Yoseph accused Grant of targeting her for complaining about the new medication administration duties. (*Id.*) Yoseph also briefly recounted her belief that her time off had been approved at least through March and that she could not understand why she was being forced into an on-call role. (*Id.*)

On February 21, 2014, Yoseph and Grant met one last time. According to Yoseph, she insisted that she was not resigning, but Grant nonetheless tried to deceive her into signing a resignation form by covering the form's title with her hand. (ECF No. 45 at 6, ¶ 27.) Grant denies trying to deceive Yoseph into signing anything, but agrees that she showed Yoseph an Employment Separation Form. (ECF No. 46 at 14, ¶ 92.) Grant asserts that she reminded Yoseph that she had chosen to resign the previous day, and she announced that Kavod would accept that resignation effective that day (*i.e.*, February 21). (*Id.*) The parties agree that the conversation ended when Grant demanded Yoseph's keys and apron, which Yoseph surrendered. (ECF No. 45 at 6, ¶ 27.)

Kavod hired another black African immigrant female to replace Yoseph. (ECF No. 46 at 14, ¶ 97.)

## F. Post-Separation Events

On May 6, 2014, Yoseph filed a charge with the National Labor Relations Board ("NLRB"), alleging that she had been fired in retaliation for engaging in protected concerted protest regarding working conditions. (ECF No. 45 at 6, ¶ 28.) On June 19,

2014, Yoseph filed a charge with the EEOC, complaining of race, sex, color, and national origin discrimination, and/or retaliation for protesting such discrimination. (ECF No. 49-13 at 1–2.)

On April 7, 2015, Kavod settled the NLRB charge. (ECF No. 45 at 6, ¶ 30.) Part of the settlement agreement included Kavod's pledge not take adverse action against employees who complain about wages, hours, or working conditions. (*Id.* at 7, ¶ 32.) The settlement agreement also required Kavod to purge the record of Wagaye's February 2014 suspension from its files. (*Id.* ¶ 31.) No party explains why this was a part of the settlement.

As for the EEOC, it eventually issued a Right to Sue letter to Yoseph, dated March 25, 2015. (ECF No. 46 at 16, ¶ 112.) Yoseph found that letter on April 15, 2015, unopened, on top of her apartment complex's collection of tenants' mailboxes. (*Id.* ¶ 113; ECF No. 49 at 12, ¶ 113.) Yoseph does not know how long the letter had been there. (ECF No. 46 at 16, ¶ 114.) She destroyed or lost the envelope in which the letter was transmitted. (*Id.* at 17, ¶ 115.)

The following day (April 16), Yoseph asked the EEOC for a new Right-to-Sue letter. (*Id.* ¶ 117.) The EEOC denied this request. (*Id.* ¶ 118.) Yoseph filed this lawsuit on July 13, 2015. (ECF No. 1.)

### III. ANALYSIS

#### A.    Timeliness of Lawsuit

Under 42 U.S.C. § 2000e-5(f)(1), a plaintiff has ninety days to file suit after receiving an EEOC Notice of Right to Sue letter. Kavod argues that Yoseph missed this deadline. (ECF No. 46 at 32–35.) Kavod says that the Right to Sue letter was mailed on March 25, 2015—an inference based on the fact that the letter bears that date—and

that the letter is presumed to be received by the addressee either three or five days later. (*Id.* at 33 (citing *Lozano v. Ashcroft*, 258 F.3d 1160, 1165 (10th Cir. 2001)).) Assuming a five-day presumptive delay between mailing and receipt, Kavod argues that Yoseph was deemed to have received the Right to Sue letter on March 30, 2015, making her complaint due no later than June 28, 2015. Yoseph did not file this lawsuit until July 13, 2015.

Kavod is correct that "[a] rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service." *Witt v. Roadway Exp.*, 136 F.3d 1424, 1429–30 (10th Cir. 1998). More specifically, the Tenth Circuit has endorsed a presumption of receipt of up to five days after mailing. *Lozano*, 258 F.3d at 1165. But ultimately, "[t]he ninety-day limit begins to run on the date the complainant actually receives the EEOC right-to-sue notice, making that date a material fact." *Witt*, 136 F.3d at 1429. "[E]vidence denying receipt [by the presumed time] creates a credibility issue that must be resolved by the trier of fact." *Id.* at 1430.

The Court finds that at least two genuine issues of material fact prevent summary judgment in Kavod's favor on the timeliness of Yoseph's lawsuit. The first issue is when the EEOC actually mailed the Right to Sue letter. Simply because the letter itself bears the date of March 25, 2015 does not mean the EEOC mailed the letter that same day. The second issue is Yoseph's actual receipt. She claims she found the letter sitting atop her apartment complex's group mailbox on April 15, 2015, perhaps implying that the letter had mistakenly been placed in some other resident's mailbox. A reasonable jury could believe or disbelieve Yoseph's story. If the jury believed the story, Yoseph's

complaint was due no later than July 14, 2015, so her filing on July 13 was timely. Kavod is not entitled to summary judgment on this matter.[9]

## B.    Nature of the Title VII Violations Claimed

Before the Court can proceed further, it must clarify the theories of Title VII liability at issue.  In her EEOC charge and her complaint, Yoseph alleges discrimination based on race, skin color, sex, and national origin; and she alleges retaliation for having complained about such discrimination.  (ECF No. 1 at 2, 7.)  However, Yoseph presented nothing in her EEOC charge or her complaint, and she presents nothing in her summary judgment papers, showing any sort of alleged discriminatory treatment that can be linked to her sex.  To the contrary, her major theory of discrimination is based on the reassignment of medicine administration duties from the Wellness Coordinator to the Resident Assistants, thus burdening the Resident Assistants and favoring the Wellness Coordinator.  But the Wellness Coordinator was a woman, and the two Kavod managerial employees most responsible for the allegedly discriminatory reassignment of duties (Grant and Dewhurst) were also women.  (*See* Part II.B, *above*.) Yoseph offers no theory by which a jury could still infer sex discrimination in these circumstances.

The Court finds that Yoseph has abandoned her claim of sex discrimination. This is consistent with her response to Kavod's summary judgment motion.  Kavod

---

[9] Kavod appears to be arguing, at least in part, that the Right to Sue letter should be presumed to have been delivered to Kavod's address writ large—*i.e.*, to the address of her apartment complex generally—within five days, and that it does not matter if Yoseph was personally aware that the letter had been delivered.  (ECF No. 46 at 33–34.)  The case Kavod cites to support this interpretation is *Million v. Frank*, 47 F.3d 385, 388 (10th Cir. 1995), which only holds that "the period for filing begins to run when there has been receipt by a member of plaintiff's household at plaintiff's address."  As Yoseph's "household" could hardly be described as comprising all the residents in her apartment building, *Million* has no application to the groups of mailboxes located at Yoseph's apartment complex.

seeks summary judgment on all of Yoseph's potential theories of relief.  (*See generally* ECF No. 46.)  Yoseph responds by arguing that she has presented valid claims for retaliation (based on her choice to complain about the medication administration changes, which she believed were discriminatory); and for race, skin color, and national origin discrimination (based on the medication administration changes).  (ECF No. 49 at 19–29.)  She says nothing about sex discrimination.

Accordingly, the analysis below focuses only on her claims for race, skin color, and national origin discrimination, and for retaliation.

**C.    Race, Skin Color, and National Origin Discrimination**

1.    <u>Legal Standard</u>

Because Yoseph offers no direct evidence of impermissible discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs her claim.

> The *McDonnell Douglas* test involves a three-step analysis.  First, the plaintiff must prove a prima facie case of discrimination.  If the plaintiff satisfies the prima facie requirements, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for its action.  If the defendant does so, the plaintiff must either show that his race, age, gender, or [an]other illegal consideration was a determinative factor in the defendant's employment decision, or show that the defendant's explanation for its action was merely pretext.

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).[10]

---

[10] As noted, Yoseph's complaint invokes 42 U.S.C. § 1981 as an additional basis for claiming discrimination.  (ECF No. 1 at 1.)  A discrimination claim under § 1981 is evaluated under the same *McDonnell Douglas* burden-shifting framework as a Title VII claim.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).  The analysis that follows therefore applies equally to Yoseph's Title VII and § 1981 theories of relief.

2.    <u>Prima Facie Case of Discrimination</u>

To establish a prima facie case for unlawful discrimination, Yoseph must show: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.  *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007) ("*PVNF*").

a.    *Protected Class*

There is no dispute that Yoseph is a member of a protected class.

b.    *Materially Adverse Action*

Broadly speaking, an adverse action is material if it is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Determining whether a plaintiff suffered a materially adverse action requires "a case-by-case approach, examining the unique factors relevant to the situation at hand," but the Court "will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action."  *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (internal quotation marks and citation omitted).

Kavod naturally argues that the change in medication administration procedures "only constituted a minor inconvenience or an alteration of [Yoseph's] job responsibilities."  (ECF No. 46 at 22.)  But Yoseph claims that it was an onerous, time-consuming change that essentially eliminated her ability to take any breaks, yet without additional compensation.

The Court need not decide whether, even under Yoseph's view of the facts, she

suffered a materially adverse employment action.  In light of the following analysis

regarding whether Yoseph was similarly situated to Sara Diaz, the Wellness

Coordinator, the Court will simply assume for argument's sake that Yoseph suffered a

materially adverse employment action when Kavod placed Diaz's responsibilities on

Yoseph and her fellow Resident Assistants.

       c.     *Circumstances Giving Rise to An Inference of Discrimination*

Yoseph fails to show that the reassignment of duties took place under

circumstances giving rise to an inference of discrimination.  Her only argument in this

regard is that "others similarly situated were treated more favorably."  (ECF No. 49 at

28.)  *Cf. PVNF*, 487 F.3d at 800–01 ("One method by which a plaintiff can meet this

burden [to present circumstances giving rise to an inference of discrimination] . . . is to

show that the employer treated similarly situated employees more favorably.").  By

"others," however, Yoseph refers only to Sara Diaz.

"To show disparate treatment, [Yoseph] must establish she was similarly situated

to [Diaz] in all relevant respects."  *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th

Cir. 2006).  Yoseph raises no triable issue of fact here.  The record makes clear that the

jobs of Wellness Coordinator and Resident Assistant were separate and wholly distinct,

and not properly comparable.  Indeed, this is partly implicit in Yoseph's own theory of

the discrimination to which she was allegedly subjected, *i.e.*, that a task originally

assigned under a particular job description (the Wellness Coordinator, of which there

was only one) was then transferred to a separate job description (the Resident

Assistant, of which there were many).

This becomes even more evident upon examination of Kavod's formal job

descriptions for both of those positions.  "The Wellness Coordinator will be responsible

for managing the medication system for the Assisted Living Program"; he or she must be a licensed practical nurse; and his or her itemized job responsibilities focus on assisted living residents' medical needs. (ECF No. 45-3 at 5–8.) By contrast, "[t]he Assisted Living Program Resident Assistant (RA) will be responsible for providing instrumental activities of daily living (IADL's) and activities of daily living (ADL's) services to Assisted Living residents"; he or she need only have a high school diploma or its equivalent; and his or her itemized job responsibilities focus on housekeeping, assisting residents with their personal care, escorting residents to and from meals, and similar tasks. (ECF No. 46-2 at 98–102.)

Yoseph acknowledges that "the Resident Assistants and Wellness Coordinator had different jobs." (ECF No. 49 at 28.) She argues, however, that she and Sara Diaz should nonetheless be considered similarly situated because "their overall objectives were the same" in the sense that their respective job descriptions both stated their "primary objective" was to "enable residents to maintain a dignified lifestyle in a non-medical home setting within the specified boundaries of the program." (ECF No. 49 at 28 (internal quotation marks omitted); *see also* ECF No. 45-3 at 5; ECF No. 46-2 at 98.) Plainly this is no more than a statement of Kavod's mission, akin to "provide outstanding customer service." It does not show that the Wellness Coordinator and the Resident Assistants were similarly situated in any material respect.

Finally, Yoseph nowhere claims that her new medicine administration duties were more onerous than the duties of those with whom she *was* similarly situated—the other Resident Assistants, among whom were other black African immigrants, white Russian immigrants, and Americans of unspecified race. Yoseph has therefore failed to

demonstrate a prima facie case of discriminatory treatment.

       3.    <u>Legitimate Nondiscriminatory Reason & Pretext</u>

Even if Yoseph had raised a prima facie case of discrimination, her claim would still fail at the later stages of the *McDonnell Douglas* framework.  Kavod has proffered two justifications for rearranging the medicine administration duties, both of which are facially neutral as to race, skin color, and national origin: (1) Grant's belief that the Medication Reminder Box system was frowned upon by CDPHE, and (2) the need to free up time in the Wellness Coordinator's schedule to take on new responsibilities transferred from other managerial positions, in turn allowing those occupying those other managerial positions to incur less overtime.  *Cf. Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) ("At [the second] stage [of the *McDonnell Douglas* analysis], [the] defendant need only explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." (internal quotation marks omitted)).  Having proffered these justifications, the burden returns to Yoseph to demonstrate that they are pretextual.

Yoseph first argues that CDPHE has not actually prohibited Medication Reminder Boxes, but Yoseph offers nothing to refute Grant's testimony that the Medication Reminder Box system is nonetheless similar to the medication delivery protocol CDPHE has in fact banned.  Nor has Yoseph put forward any evidence which controverts Grant's assertion that it is her (Grant's) understanding that CDPHE does not recommend Medication Reminder Boxes.  Yoseph also argues that the Wellness Coordinator's formal, written job description was not changed after November 2013 to reflect the elimination of the Wellness Coordinator's duty to fill the Medication Reminder Boxes.  But Yoseph does not spell out what inference she believes the jury could draw

from this.  At best, she seems to be implying that a change not formally reduced to writing is not a sincere change, or not one intended to be permanent.  This is perhaps true, but there is no question that Kavod in fact reassigned Diaz's duties to the Resident Assistants, and no party has put forth any evidence that the change was only temporary, *e.g.*, to burden particular employees until they felt compelled to resign.

In this light, Yoseph has raised no more than a scintilla of possible pretext, which is not enough to avoid summary judgment, particularly considering what happened here: Kavod took one particular job duty assigned to a single employee (a white American female of Hispanic heritage) and redistributed that job duty to group of employees who were of both genders and various national origins and skin colors.  Yoseph has not put forth sufficient evidence from which a jury could conclude in her favor that Kavod's actions were discriminatory on the basis of race, skin color, or national origin.  Kavod is therefore entitled to summary judgment on Yoseph's Title VII and § 1981 discrimination claims.

## D.     Retaliation

### 1.     Legal Standard

Title VII specifically prohibits employers from retaliating against employees who complain of unlawful discrimination.  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . .").  Actionable retaliation refers to any action that, when viewed objectively, "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006) (internal quotation marks omitted) ("*White*").

Like Title VII discrimination claims, retaliation claims proceed under the *McDonnell Douglas* burden-shifting framework in the absence of direct evidence of retaliation. *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016). Thus, Yoseph must establish a prima facie case of retaliation, Kavod must respond with a legitimate explanation for the alleged retaliatory action, and Yoseph must then demonstrate that Kavod's explanation is a pretext.[11]

2.    Prima Facie Case

A plaintiff establishes a prima facie case of retaliation by showing: (1) "that she engaged in protected opposition to discrimination"; (2) "that a reasonable employee would have found the [allegedly retaliatory] action materially adverse" within the meaning of the Supreme Court's *White* decision, above; and (3) "that a causal connection exists between the protected activity and the materially adverse action." *PVNF*, 487 F.3d at 803.

a.    *Protected Opposition*

Here, the parties genuinely dispute whether Yoseph complained about discrimination based on race, skin color, or national origin. Yoseph claims she did; Kavod claims she did not, and instead confined her complaints to the alleged unfairness of the extra work. Kavod has not demonstrated that no reasonable jury could believe Yoseph's testimony. It is a jury question, then, whether Yoseph actually protested discrimination based on race, skin color, or national origin.

---

[11] This analysis applies equally to the extent Yoseph proceeds under § 1981. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("42 U.S.C. § 1981 encompasses claims of retaliation").

b.     *Materially Adverse Action*

As for the allegedly retaliatory actions taken by Kavod, Yoseph points both to her reclassification as on-call and to her eventual termination. She believes that Kavod, through Grant, took these actions in retaliation for her choice to sign the January 13, 2014 protest letter and to participate generally with the other signatories in complaining about working conditions—complaints which allegedly included assertions of race, skin color, and/or national origin discrimination, as just discussed. (ECF No. 45 at 9–13; ECF No. 49 at 19–25.)[12] It is not clear whether these two adverse actions (reassignment to on-call status, and then termination) should be treated separately, given that one essentially flowed into the other. From Yoseph's perspective, it would seem, the reassignment was tantamount to a constructive discharge. But both sides treat the two events separately, and so the Court will do the same for present purposes.

Kavod argues that the reassignment to on-call status "[was] not an adverse employment action because [Yoseph] was not able to perform, and therefore not qualified for, her job duties due to severe and consistent absenteeism." (ECF No. 46 at 32.) That may be a legitimate nonretaliatory reason for the reassignment, but it does not address the current inquiry, *i.e.*, whether reassignment to on-call status—with its attendant drop in pay and lack of a regular schedule—"well might have dissuaded a

---

[12] The parties' briefs contain some factual back-and-forth about a claim by Yoseph that Grant, in December 2013, promised her an annual raise of $11.43/hour (up from $11.10/hour), but when Yoseph received her first paycheck in 2014, her raise was only $11.38/hour. But Yoseph does not raise this as a potential act of retaliation in her summary judgment motion. Furthermore, although Kavod specifically argues in its summary judgment motion that any claim of retaliation based on a supposedly diminished raise fails as a matter of law (ECF No. 46 at 29–31), Yoseph's response brief provides no counterargument. The Court therefore deems Yoseph to have abandoned any claim based on the allegedly diminished raise. *Cf. Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 791 (10th Cir. 2013) (party forfeited counterargument that was not raised in a summary judgment response but naturally should have been, given that it would have mooted analysis of other arguments made in the summary judgment motion).

reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68–69. Kavod has thus conceded the issue, and it is beyond dispute in any event. *Cf. Morales-Vallellanes v. Potter*, 605 F.3d 27, 33 (1st Cir. 2010) ("Often, whether an employee has suffered a materially adverse employment action capable of supporting claims under Title VII is a question of law for the court."). Accordingly, Yoseph is entitled to summary judgment in her favor on the limited question of whether reassignment to on-call status was a materially adverse action.

It is likewise beyond dispute that Yoseph's actual termination was a materially adverse event. Kavod asserts that Yoseph resigned entirely of her own volition, but that is a material dispute of fact and a reasonable jury could believe Yoseph's story in this regard. Accordingly, neither party is entitled to summary judgment on the question of whether Yoseph suffered a materially adverse employment action when her employment with Kavod ended.

c. *Causal Connection*

Yoseph signed the January 13, 2014 letter and participated in the meeting with Dewhurst that same day, leading to other meetings with Grant later in the month. Yoseph learned no later than February 15, 2014, that she was being converted to on-call status. And she was (according to her) terminated on February 21, 2014. "[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (summarizing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994)). Thus, Yoseph has presented enough evidence from which a jury could infer a causal connection, although the evidence is not so overwhelming that a jury could *only* infer a causal connection. Neither party is entitled to summary judgment on this

point.

       3.    <u>Legitimate Nonretaliatory Reason & Pretext</u>

Kavod explains its nonretaliatory motive for changing Yoseph to on-call status essentially as follows: Kavod was preparing for the conversion to restaurant-style dining. That conversion, and the weekend shift more generally, required consistency. Yoseph had already announced her intent to be absent every Saturday and Sunday through April. Even though she had arranged coverage for those absences, it would necessarily disrupt the needed consistency—which, as it turns out, Yoseph had already been disrupting for many months as she found substitutes for nearly all of her Saturday and Sunday shifts. Thus, Yoseph was not the right person for the shift to which she was normally assigned.

This explanation, if believed, is nondiscriminatory. But the Court agrees with Yoseph that a reasonable jury could find it pretextual. Most obviously, a jury could conclude that this explanation is unusually strained, given that Grant's major concern—consistency—would seem to have been satisfied by Yoseph arranging for two specific individuals (Seta and Saba) to cover her shifts through the end of April. On the other hand, a jury could also believe Grant that she lost all faith in Yoseph's ability to be a consistent employee at any time, coverage or no coverage, and that such lack of consistency was harming Kavod's relationship with its residents and causing strain on other staff members. Whom to believe must therefore be left to the jury. Neither side is entitled to summary judgment on Yoseph's retaliation claims.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Plaintiff's Motion for Summary Judgment (ECF No. 45) is GRANTED on the

limited issue of whether her conversion to on-call status was a materially adverse employment action, but otherwise DENIED;

2. Defendant's Motion for Summary Judgment (ECF No. 46) GRANTED with respect to Plaintiff's discrimination (disparate treatment) claims under Title VII and 42 U.S.C. § 1981, but otherwise DENIED;

3. This matter REMAINS SET for a Final Trial Preparation Conference on September 1, 2017 at 3:00 PM, and a 3-day jury trial to begin on September 18, 2017 at 8:30 AM, both in Courtroom A801.

Dated this 27th day of June, 2017.

BY THE COURT:

William J. Martinez
United States District Judge